Angelo J. SPEZIALE, Plaintiff,

v.

BETHLEHEM AREA SCHOOL
DISTRICT, et al.,
Defendants.

No. 01–CV–5218.

United States District Court,
E.D. Pennsylvania.

June 2, 2003.

Donald P. Russo, Vanessa M. Nenni, Bethlehem, PA, for plaintiff.

Ellis H. Katz, Jason R. Wiley, Sweet, Tucker & Katz LLP, New Britain, PA, for defendants.

ANITA B. BRODY, District Judge.

### MEMORANDUM AND ORDER

On October 15, 2001, plaintiff Angelo J. Speziale, filed a complaint against defendants Bethlehem Area School District ("BASD") and Thomas J. Doluisio ("Doluisio"), the Superintendent of the BASD. On January 4, 2002, plaintiff filed an Amended Complaint. On January 31, 2002, plaintiff filed a Second Amended Complaint. On April 24, 2002, plaintiff

voluntarily dismissed Doluisio and the Second Amended Complaint. On May 9, 2002, plaintiff filed a Third Amended Complaint and, on July 29, 2002, the parties stipulated that Count V of plaintiff's Third Amended Complaint should be dismissed with prejudice. The central issue in all the complaints was whether BASD and Doluisio forced plaintiff to retire from his position with the school district. Those claims now before the court are: Count I, violation of 42 U.S.C. § 1983, procedural due process violations; Count II, violation of liberty interest in employment in violation of 42 U.S.C. § 1983; Count III, violation of anti-retaliation provisions of the Family and Medical Leave Act of 1993, 29 U.S.C. § 261(a)(1); and Count IV, violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701.

Defendant has moved for summary judgment. For the reasons addressed below, I will grant defendant's motion.

## FACTUAL BACKGROUND[1]

Plaintiff began working for BASD in November 1985 as Coordinator of Instructional Materials/Libraries. Compl. ¶ 5. During his employment, plaintiff received "above expected" ratings and pay raises every year. (*Speziale* at 57:12–20).[2] During the period in question, plaintiff's immediate supervisor was first Tony Villani ("Villani") and, later, Monty Perfetti ("Perfetti"). Perfetti reported to Doluisio. (*Speziale* at 13:6–7; 184:6–21). Until about January 1996, plaintiff and Doluisio would occasionally socialize. These gatherings included getting drinks together at a Holiday Inn after school board meetings and meals which the men and their families would both attend. These interactions abruptly stopped sometime after January 1996. (*Speziale* at 27:10–17; 90:18–91:3).

In the mid–1990s, plaintiff approached Villani about the need to hire a full-time employee to work with the district-wide network. (*Speziale* at 13:3–7). Plaintiff suggested that Villani promote a computer specialist named Scott Garrigan ("Garrigan") to the new post. (*Speziale* at 13:23–14:10). Shortly after Garrigan's appointment as network coordinator, plaintiff found that Garrigan was unable or unwilling to cooperate with plaintiff. (*Speziale* at 15:14–21). Plaintiff soon notified Perfetti of his concerns. (*Speziale* at 16:10–13). He also notified Doluisio. (*Speziale* at 17:3–5). Plaintiff's complaints about Garrigan's performance persisted up until plaintiff left his job. (*Speziale* at 16:16–19). In addition to his concerns about Garrigan's lack of teamwork, Plaintiff felt that Garrigan was attempting to supplant him by taking on responsibilities previously held by plaintiff. (*Speziale* at 39:4–10). It appears that Doluisio contributed to the tension between plaintiff and Garrigan, insofar as Doluisio gave duties previously held by plaintiff to Garrigan and permitted Garrigan to take over other duties initially assigned to plaintiff. (*Speziale* at 17:14–18:9; 39:12–15). In the summer of 1997, Perfetti also took away a responsibility that plaintiff had successfully performed throughout his employment: the preparation of purchase orders for instructional materials. (*Speziale* at 32:6–13). This move was a particular affront to plaintiff, who had, over his thirteen years with the school district, developed the instructional materials center into one of the most dy-

---

1. In deciding this motion for summary judgment, all reasonable inferences must be drawn, and conflicting evidence resolved, in favor of plaintiff, who is the nonmovant. *See Fuentes v. Perskie,* 32 F.3d 759, 762 n. 1 (3d Cir.1994)

2. Citations to deposition transcripts are made in the following format: ([*Deponent's name*] at [page number]:[line number])

namic centers of its kind in the state. (*Speziale* at 33:6–17).

This last restriction on his work load prompted plaintiff to send Doluisio and Perfetti a memo in March of 1999 protesting the perceived effort by the two supervisors to undermine his professional standing. (*Speziale* at 34:14–20; 35:12–14). In this memo, plaintiff asked "Are you trying to force me out?" (*Speziale* at 38:12–15). Around this time, plaintiff found that he was not permitted to schedule an appointment with Doluisio and that Doluisio would not return his phone calls. (*Speziale* at 58:10–14). Plaintiff consulted Perfetti to determine what weaknesses in his performance justified the steady erosion of his professional responsibilities, but Perfetti insisted that everything was fine. (*Speziale* at 59:15–60:8). At a dinner reception attended by both Doluisio and plaintiff, plaintiff requested sabbatical leave. Doluisio denied this request. (*Speziale* at 163:13–23).

In an effort to follow up on his March memo to Doluisio, plaintiff sent the superintendent another memo in April of 1999. (*Speziale* at 55:6–7). Doluisio, however, avoided plaintiff until September of 1999, when he scheduled and held a two-and-a-half hour meeting with plaintiff. (*Speziale* at 66:6–15, 69:19–23). At this meeting, Doluisio said that plaintiff "was not offering anything to the organization and never [had]." (*Speziale* at 66:7–12). During the meeting, Doluisio "berated" plaintiff and asked plaintiff to provide him with a job description by December 1st. (*Speziale* at 69:13–16). At this meeting, Doluisio informed plaintiff that "The longer you delay your retirement, the more aggressive I'm going to be with your job description." (*Speziale* at 74:14–16). The two men also discussed a contract that plaintiff had with Wilkes University. Based upon the income he anticipated earning from this con-

tract, plaintiff and his wife had taken out a loan. (*Speziale* at 74:24–75:6). Doluisio, despite allegedly having known about the contract for some time, informed plaintiff that he would not be allowed to do independent consulting in addition to his job with the school district. (*Speziale* at 75:6–19). When plaintiff protested about the economic consequences, Doluisio dismissed plaintiff's concerns with the words "I don't give a fuck about you or your family." (*Speziale* at 75:2–11). Plaintiff felt that this contentious meeting was an excuse to try and make plaintiff resign because, although the meeting was ostensibly set up to improve plaintiff's performance, none of his prior evaluations indicated any problem with his performance. (*Speziale* at 79:6–80:16). Moreover, after the meeting plaintiff asked Perfetti for more information regarding the new job description requested by Doluisio. Perfetti responded "I have no idea what the superintendent was talking about," adding that the job description "was never discussed with me." (*Speziale* at 84:4–12).

At the end of September, plaintiff took a three-week medical leave. (*Speziale* at 93:22–25). While on leave, plaintiff regularly consulted with his three secretaries. Each time he called, they told plaintiff that there were no problems to report. These responses contrasted sharply with plaintiff's prior experience—previously, the secretaries regularly paged and contacted plaintiff with problems even when he was engaged in activities where he was not to be disturbed. (*Speziale* at 198:14–199:18). After two weeks of silence, plaintiff told his secretaries, "Look, the handwriting's on the wall. I'm not going to call you anymore. If there's a concern or a problem that crops up, you call me, because this is embarrassing." (*Speziale* at 199:19–24).

Plaintiff returned to work on October 18, 1999. Compl. ¶ 27. On October 27, 1999, plaintiff's father passed away. Compl. ¶ 28. After taking bereavement leave, plaintiff unsuccessfully sought clarification regarding Doluisio's request for a job description. (*Speziale* at 96:14–25). Around this time, Perfetti also informed plaintiff that "You fucking pissed me off for taking those three weeks." (*Speziale* at 97:19–25). After plaintiff returned to work, Perfetti deluged him with memos as a means of putting pressure on him. (*Speziale* at 99:2–19). Some of these memos accused plaintiff of failures for which he was not responsible. (*Speziale* at 99:20–100:8). Shortly after these events occurred, plaintiff took leave for the remainder of the 1999–2000 school year. (*Speziale* at 112:21–113:4). At least in the initial stages of his leave, plaintiff still envisioned returning to work the following year, at least with regard to the administration of a contract with Wilkes University that plaintiff had "[given] birth to." (*Speziale* at 122:11–22; 123:19–25, 124:8). At some point during his medical leave, however, plaintiff came to feel that he had been constructively discharged. (*Speziale* at 125:11–21). In a letter dated February 22, 2000, Plaintiff informed BASD that he planned to retire at the end of the school year. (*Speziale* 194:13–19). In order to maximize the amount of his pension, however, plaintiff formally retired in September of 2000. (*Speziale* at 112:21–113:2).

After plaintiff's retirement, he was surprised when no prospective employers called to enquire about his availability. Such calls were normal for well-respected retirees. (*Speziale* at 141:2–18). Also, in 1998 and 1997, superintendents from other school districts had expressed interest in retaining plaintiff as a consultant. (*Speziale* at 147:15–22). Plaintiff attributed this silence to rumors then circulating about him, some of which included allegations that BASD had asked plaintiff to leave. (*Speziale* at 143:6–14, 150:8–10).

Plaintiff's ultimately unsuccessful effort to find work with a consultant named Ron Thompson ("Thompson") and the Pocono Mountain School District ("PMSD") suggested that rumors regarding his tenure with BASD were, in fact, circulating. In or before September 2000, Thompson had asked plaintiff if he were interested in doing consulting work. (*Speziale* at 153:18–154:11). That month, plaintiff called Thompson with a business proposal that they could present to the PMSD. (*Speziale* at 154:10–19). Plaintiff and Thompson met with the PMSD. The morning meeting went well and that afternoon Thompson called plaintiff to tell him that they had received the contract and were to begin working right away. During the telephone call, Thompson told plaintiff, "You know, the only—the funny thing is, is that the only question they asked, of all the hundreds of questions they could ask regarding telephone and network systems, was they wanted to know what your role was if this contract is awarded." (*Speziale* at 155:20–156:13). Before ending the call, Thompson told plaintiff that he would get back to him. (*Speziale* at 157:12–13). Thompson never called plaintiff back after that telephone conversation. (*Speziale* at 156:22–24).

At no point during or after his employment with BASD did plaintiff request a hearing with the school board. (*Speziale* at 114:3–9). He did not request a hearing because he believed that the school board would never go against Doluisio's desire to be rid of plaintiff. (*Speziale* at 115:15–25). Plaintiff based this conclusion on his regular attendance at public board meetings for 13 years. (*Speziale* at 131:20–132:7).

During the fall of 1999 plaintiff struggled with depression. (*Speziale* at 194:22–

195:6). Perfetti was aware of plaintiff's disability and the district had documentation from plaintiff's treating physician testifying to his depression. (*Speziale* at 160:14–161:24; 194:22–195:6). Despite his potential eligibility, at no time before his retirement did plaintiff request leave time under the Family and Medical Leave Act. (*Speziale* at 106:19–21).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must determine "whether the evidence presents a sufficient [factual] disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the Court must view the evidence, and draw all reasonable inferences, in the light most favorable to the non-moving party. *See Dici v. Com. of Pa.*, 91 F.3d 542, 547 (3d Cir.1996). However, when the nonmoving party "bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the non-

moving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n. 5 (3d Cir.1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n. 2 (3d Cir.1998)).

## DISCUSSION

Defendant has moved for summary judgment on all four remaining counts of plaintiff's complaint. These counts involve two alleged violations of plaintiff's procedural due process rights, one violation of the Family and Medical Leave Act ("FMLA"), and one violation of the Rehabilitation Act. In this same order, I will address whether plaintiff, via his response to defendant's summary judgment motion, has raised a genuine issue as to any material fact relating to these claims.

### A. Procedural Due Process[3]

Plaintiff brings his procedural due process claims against defendant under the Fourteenth Amendment and 42 U.S.C. § 1983. To succeed, Fourteenth Amendment procedural due process claims must allege a state-sponsored deprivation of a protected interest in life, liberty, or property.[4] *See Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). To establish a § 1983 claim, a plaintiff must show that a person acting under color of state law deprived him of a right secured by the Constitution or the laws of the United States.[5] Plaintiff

---

3. In plaintiff's response to defendant's Motion for Summary Judgment, counsel raises an argument regarding plaintiff's *substantive* due process rights and the deprivation of plaintiff's property interest in his continued employment. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 15. As mentioned earlier, plaintiff's counsel submitted a series of complaints and amended complaints. The Third Amended Complaint on which I now rely alleges only *"procedural* due process violations." Plaintiff's counsel cannot reasonably expect to amend the complaint after the close

of discovery merely by raising new arguments in the responsive papers. I will therefore not address plaintiff's substantive due process arguments.

4. This amendment provides that no state "shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

5. The statute provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage,

claims that BASD is a state actor that deprived him of his constitutional rights by violating his Fourteenth Amendment due process property and liberty interests. I will address these two interests separately.

### 1. Plaintiff's Alleged Property Interest

The Supreme Court has held that a public employee has a protected property interest in his or her continued employment by the government. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547–58, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Plaintiff alleges that BASD, by and through the actions of its employees, constructively discharged him and thereby deprived him of this interest. (*Speziale* at 125:11–21). He does not dispute, however, the fact that he retired. (*Speziale* at 128:15–18).

An employee's resignation or retirement from public employment is "presumed to be voluntary." *Leheny v. City of Pittsburgh,* 183 F.3d 220, 227 (3d Cir.1999). The Third Circuit has explained that:

> This presumption remains intact until the employee presents evidence to establish that the resignation ... was involuntarily procured. If an employee retires [or resigns] of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights.

*Id.* Adopting the reasoning of an Eleventh Circuit opinion, *Hargray v. City of Hallandale,* 57 F.3d 1560 (11th Cir.1995), the *Leheny* court held that an employee's resignation will be considered involuntary only if: (1) the employer forces the resignation by using coercion or duress, or (2) the employee resigned because the employer deceived or misrepresented a material fact to the employee. *Id.* (citing *Hargray,* 57 F.3d at 1568). In determining whether the resignation is voluntary, the court considers all the circumstances surrounding the plaintiff's resignation. *O'Connell v. County of Northampton,* 79 F.Supp.2d 529, 533 (E.D.Pa.1999). Because plaintiff has neither alleged nor presented evidence of deception or material misrepresentation by defendant, I will limit my analysis to the question of whether plaintiff's resignation resulted from duress or coercion.

It is unclear what standard a district court should use when determining whether a resignation resulted from duress or coercions. My colleague the Hon. Eduardo C. Robreno has listed five factors to consider in making such an inquiry. They are: (1) whether the employee was presented with an alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee had a reasonable time to choose; (4) whether the employee was permitted to select the effective date of his resignation; and (5) whether the employee had the advice of counsel. *O'Connell,* 79 F.Supp.2d at 533 (citing *Hargray,* 57 F.3d at 1568).

The decision over whether or not to adopt the five-factor test employed in *O'Connell* and *Hargray* arises from the following circumstances: In *Leheny,* the Third Circuit approvingly cited the Eleventh Circuit's *Hargray* opinion when discussing which factual scenarios could rebut the presumption that a public employee's

---

of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to party injured in an action at law...." 42 U.S.C. § 1983.

resignation was voluntary, ultimately agreeing that these scenarios were limited to situations involving coercion/duress or material misrepresentation. *Leheny,* 183 F.3d at 227. The *Leheny* court did not, however, explicitly adopt *Hargray's* five factors as the test for determining whether or not coercion or duress had caused the plaintiff to retire. The issue before the court was whether a material misrepresentation had occurred. *Id.* at 228. Prior to *Leheny,* two cases decided within this district had addressed the question of what standard to use for constructive discharge claims brought under the Fourteenth Amendment and § 1983. In the first case, the Hon. Louis H. Pollak, after noting that "[t]he elements required to establish a constructive discharge claim under the due process clause are not entirely clear," applied "the least demanding standard-Title VII's so-called 'intolerable circumstances' standard" to determine whether the defendant had unlawfully denied the plaintiff's constitutional property interest. *Desper v. Montgomery County,* 727 F.Supp. 959, 964 (E.D.Pa.1990).[6] The second case, decided between *Desper* and *Leheny,* also applied the "intolerable circumstances" test to a public employee's complaint that his employer constructively discharged him in violation of § 1983 and his 14th Amendment procedural due process property right. *See Goldberg v. City of Philadelphia,* No. 91–7575, 1994 WL 313030 (E.D.Pa. June 29, 1994). Neither *Leheny* nor *O'Connell* cited these two earlier cases, nor did they address the question of what legal significance attaches to the difference between the five-factor test and the "intolerable circumstances" test. Because *Leheny* did not discuss what standard should be used

for defining coercion or duress, there is an unresolved split on this issue among the courts within this district.

It is not necessary for me to weigh in on this dispute today. Regardless of whether I adopt the *O'Connell/Hargray* test or the "intolerable circumstances" test, I find that plaintiff has failed to raise a material question of fact as to whether his resignation was involuntary or coerced. The discussion below examines why.

Under the five factors of *O'Connell/Hargray,* plaintiff has no evidence that his resignation was involuntary: First, plaintiff was presented with an alternative to resignation insofar as the school district never suggested that he resign and he was therefore free to continue with his employment. Although there is evidence that Doluisio pressured him to retire, there is no evidence that plaintiff had no choice about whether or not to accede to Doluisio's wishes. While unquestionably capable of rendering plaintiff's working environment unpleasant, Doluisio did not have the power to remove plaintiff from his position. Only the school board had that authority, and plaintiff never communicated with members of the school board about his employment. *See* 24 P.S. § 11–1122 (Purdon 1992). Thus plaintiff, technically, had a choice about whether to resign.

Second, plaintiff understood the nature of the choice before him. The record shows that plaintiff kept abreast of retirement options throughout his employment. (*Speziale* at 179:20–180:15). Plaintiff's preparations for retirement do not show that he planned to retire. They do, however, demonstrate that he was aware of the financial consequences of choosing

---

**6.** In *Gray v. York Newspapers, Inc.,* 957 F.2d 1070 (3d Cir.1992), the Third Circuit defined the "objective test [for] determining whether an employee was constructively discharged from employment [as] whether 'the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.'" 957 F.2d at 1079.

when to do so. Plaintiff was also aware of the emotional and medical consequences of retiring. (*Speziale* at 125:16–21; 126:20–127:24). Nothing in the record suggests that plaintiff did not understand the ramifications of choosing to retire.

Third, plaintiff had a reasonable amount of time in which to decide whether to retire. Plaintiff stated that when he initially took medical leave in October of 1999, he planned to return. There were approximately four months between when plaintiff left work in the fall of 1999 and when he sent BASD a February 2000 letter expressing his intent to retire. (*Speziale* at 194:13–19). During this time, plaintiff was away from the pressure allegedly applied by Doluisio and Perfetti, with a reasonable amount of time to decide whether to return to work.

Fourth, plaintiff had control over the effective date of his resignation. In the February 2000 letter that plaintiff sent to BASD, notifying them of his intention to retire, plaintiff described his plan to retire at the end of the 1999–2000 school year. (*Speziale* at 195:15–20). Ultimately, plaintiff chose to retire on September 22, 2000, so that he would not be penalized for retiring early. (*Speziale* at 196:6–17). In the correspondence between plaintiff, the Pennsylvania State Retirement System, and BASD that took place between plaintiff's sending his February 2000 letter and his September 2000 retirement, plaintiff successfully negotiated for a retirement date that allowed him not to return to work and to maximize his retirement benefits. This exchange demonstrates plaintiff's control over when to resign.

Finally, it does not appear that plaintiff had the advice of counsel. Plaintiff has not, however, presented evidence of how the advice of counsel would have altered his decision about retiring.

Having addressed the five factors considered in *O'Connell* and *Hargray,* I find there is no outstanding question of material fact as to whether defendant or its agents coerced plaintiff into retiring. Plaintiff appears to have chosen between two options: he could either continue working in an uncomfortable work environment or he could retire and lose the satisfaction of overseeing the instructional materials center that he helped develop and the potential to retire with a larger pension. "Resignations obtained in cases where an employee is faced with unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff had a choice.' " *Hargray,* 57 F.3d at 1568 (quoting *Christie v. United States,* 518 F.2d 584, 587, 207 Ct.Cl. 333 (1975)). Plaintiff has failed to present evidence that his choice between two imperfect options was not, in fact, a choice. He has therefore failed to rebut the presumption that his retirement was voluntary.

■ Plaintiff has also failed to raise a material question of fact as to whether he resigned due to coercion or duress under the "intolerable circumstances" test. The Third Circuit has defined this "objective" test as one that asks whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray,* 957 F.2d at 1079. Although plaintiff has presented evidence both that Doluisio may have pressured him to resign and that he might have suffered under this pressure, plaintiff has not presented evidence of circumstances so unpleasant that a reasonable person would forseeably resign. Asking an employee to prepare a job description is not an extraordinary measure, nor is failing to provide guidance as to what form the description should take, nor is reassigning job duties. While

an ideal supervisor would provide guidance, respond to memos and telephone calls, demonstrate concern for an employee's financial situation, be understanding of health-related absences, and be unflaggingly supportive, the failure to do so does not amount to intolerable circumstances. In this case, even if all of plaintiff's allegations are true, there is no evidence establishing circumstances under which a reasonable person would feel compelled to resign and the defendants' actions thus did not constitute constructive discharge.

Because plaintiff has not presented evidence for why his retirement should not be presumed voluntary, I find he has failed to raise a material question of fact with regard to Count I of his complaint.

### 2. Plaintiff's Alleged Liberty Interest

■ The Supreme Court has held that an individual has a legally-protected interest in his or her reputation. *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). For government action to infringe the "reputation, honor, or integrity" of an individual, the government action must involve a publication that is "substantially and materially false." *Ersek v. Township of Springfield*, 102 F.3d 79, 84–85 (3d Cir. 1996) (citing *Codd v. Velger*, 429 U.S. 624, 627–29, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977)). The government action must also harm the plaintiff. *Id.* at 84.

■■ In this case, plaintiff argues that BASD is responsible for unidentified rumors that may or may not have reached PMSD officials. These rumors, plaintiff believes, led PMSD to influence Thompson in such a way that plaintiff was excluded from the possible contract between PMSD and Thompson. (*Speziale* at 158:7–159:24). The Third Circuit has held that harm to future employment possibilities may show sufficient stigma to allow a claim for a violation of a liberty interest. *See McKnight v. Southeastern Pa. Trans. Auth.*, 583. F.2d 1229, 1236 (3d Cir.1978). The possible existence of harm to plaintiff's reputation is not dispositive of the question now before me. Rather, to get past summary judgment, the court must also find that there is a genuine question of fact as to whether false statements were made that caused the harm. *Ersek*, 102 F.3d at 84. Plaintiff has presented no evidence of any statements made by defendant. Thus, I cannot even begin to determine whether these statements were potentially false, nor can I ascertain whether these statements caused plaintiff harm. Although there is circumstantial evidence that PMSD heard something negative about plaintiff, based on plaintiff's hearsay evidence regarding what Thompson reported that administrators at PMSD had said, there is no evidence that BASD made any of these statements. There is also no evidence that BASD made statements that were false. In support of his position, plaintiff can only conjecture that the rumors upon which PMSD personnel might have relied might have been that BASD asked him to leave. Hypotheses, however, are not evidence. For these reasons, I find that plaintiff has failed to raise a material question of fact with regard to whether BASD denied him his constitutionally-protected liberty interest in his reputation, honor, and integrity. I will therefore grant defendant's motion for summary judgment for Count II.

### B. Family and Medical Leave Act

■ Count III of plaintiff's complaint alleges that defendant violated the anti-

retaliation provision of the FMLA. The FMLA requires an employer to grant 12 weeks of leave to qualifying employees. 29 U.S.C. § 2612(a)(1). Plaintiff suggests that he would have qualified for these twelve weeks of leave under § 2612(a)(1)(D), which protects employees whose "serious health condition[s]" render the employee "unable to perform" their job functions. 29 U.S.C. § 2612(a)(1)(D). The FMLA also makes it unlawful for an employer to interfere with, restrain, or deny the exercise, or the attempt to exercise, any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). Similarly, an employer may not discriminate against an individual who opposes a practice that the FMLA forbids. 29 U.S.C. § 2615(a)(2).

Plaintiff specifically states that he did not exercise a right provided by the FMLA: despite possibly qualifying for FMLA leave, he did not ask for leave under this federal statute. (*Speziale* at 106:19–21). In fact, plaintiff stated that the FMLA "was the least of [his] concern." (*Speziale* at 106:24). Furthermore, plaintiff has not testified that he opposed a practice made unlawful by the FMLA. Under these circumstances, it is difficult to see how plaintiff can bring an FMLA claim for retaliation. Plaintiff has presented no caselaw to support the proposition that an employee who did not take leave under the FMLA can sue for retaliation for the exercise of an FMLA right. Absent such a decision, the statutory language is controlling. *Cf. Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir.1997) (holding that, without evidence of contrary Congressional intent, "a word in a statute must be given its 'ordinary or natural' meaning") (quoting *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). Because plaintiff neither exercised nor considered exercising a right under the FMLA, defendant cannot have interfered with plaintiff's exercise of his FMLA right,

nor can it have retaliated against him for exercising it. I will therefore grant summary judgment with respect to Count III of plaintiff's complaint.

### C. Rehabilitation Act

■ In Count IV of his complaint, plaintiff alleges that BASD violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), by constructively discharging him due to his mental impairment. Compl. ¶¶ 92, 95. Section 504 of the Rehabilitation Act provides, in pertinent part, that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. 794(a).

■ To establish a prima facie case of discrimination under § 504, an employee must demonstrate: (1) that she or he has a disability; (2) that she or he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that she or he was nonetheless terminated or otherwise prevented from performing the relevant job duties. *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 229 (3d Cir.2000) (quoting *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996)).

Plaintiff has raised material questions of fact with regard to the first two elements of the prima facie case: there is evidence that his depression constitutes a disability and that he was otherwise qualified to perform the essential functions of his job. Plaintiff has not, however, raised a material question of fact with regard to whether he was terminated or otherwise prevented from performing his job. As discussed above, I find that plaintiff has failed to provide evidence that he was constructive-

ly discharged. These findings are supported by plaintiff's deposition:

Q. So how is it that in November of 1999 you believed that you could return to work, if you assert in your complaint that you believe you had been discharged in October of 1999.

A. I believe it was not, in fact, a discharge.

Q. Pardon me?

A. I believed that, but I was not effectively discharged.

Q. What do you mean by that, you were not effectively discharged?

A. Nobody told me you're fired.

(*Speziale* at 123:2–14). By plaintiff's own testimony, BASD did not terminate him. Plaintiff's testimony on when and whether BASD constructively discharged him is inconsistent. Regardless, having previously examined the totality of the circumstances in which plaintiff chose to retire, I reiterate my finding that he has failed to present evidence that his discharge was involuntary. If plaintiff cannot present any evidence that BASD terminated or constructively discharged him, he cannot make out a prima facie case. Therefore, I will grant defendant's motion for summary judgment on Count IV of the complaint.

## CONCLUSION

Plaintiff has presented evidence that his working conditions at BASD were at times far from pleasant. He has not, however, presented evidence that the conditions were so intolerable that a reasonable person would forseeably resign or retire if forced to work in those same circumstances. For better or worse, the role of the federal courts in policing the workplace is not to ensure that employees are treated with civility, compassion, or reason. Rather, it is to ensure that those rights protected by the Constitution and federal law are respected and enforced.

Plaintiff has failed to present evidence that his resignation from BASD was obtained through unlawful means. For this reason I will grant defendant's motion for summary judgment of plaintiff's Third Amended Complaint.