Michael A. O'DELL Plaintiff,

v.

**DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA Defendant.**

No. CIV.A.3:02–130J.

United States District Court,
W.D. Pennsylvania.

Sept. 28, 2004.

Jana H. Finder, Esquire, Disabilities Law Project, Pittsburgh, PA, for plaintiff.

D. Michael Fisher, Rodney M. Torbic, Office of the Attorney General, Pittsburgh, PA, Susan J. Forney, Office of Attorney General Fifth Floor, Manor Complex, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION AND ORDER

GIBSON, District Judge.

This case comes before the Court on Department of Public Welfare of the Commonwealth of Pennsylvania's (hereinafter "Defendant") Motion for Summary Judgment. (Document No. 25). In consideration of the Defendant's Motion for Summary Judgment (Document No. 25), Michael A. O'Dell's (hereinafter "Plaintiff") Brief in Opposition to the Motion for Summary Judgment (Document No. 31), and the record of court in the case *sub judice*, the Court denies the Defendant's Motion for Summary Judgment for the following reasons.

## JURISDICTION AND VENUE

Jurisdiction is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1331 and 1343, and pursuant to 42 U.S.C. § 12133. The Plaintiff's claims are authorized by 28 U.S.C. §§ 2201–2202, 42 U.S.C § 12133, and 29 U.S.C. § 794a. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the events which gave rise to this Complaint occurred in this judicial district.

## FACTUAL BACKGROUND

The Plaintiff began working as an Income Maintenance Caseworker for the Clearfield County Assistance Office ("CAO") in February of 1997. (Document Nos. 27 & 30). The CAO is "operated by the Pennsylvania Department of Public Welfare ('DPW')". (Document No. 27).

On February 23, 2000, the Plaintiff was involved in an automobile accident which rendered the Plaintiff quadriplegic. (Document Nos. 27 & 30). After the accident, the Plaintiff's mother was authorized to "handle all of his affairs through a 'Power of Attorney'". (Document No. 27; *see also* Document No. 30). Acting under this authorization, the Plaintiff's mother requested on behalf of the Plaintiff a leave of absence from his employment. *Id.*

In a letter dated March 17, 2000, the CAO granted the Plaintiff's request for "six months leave without pay with benefits beginning March 17, 2000 and ending September 14, 2000" (Document No. 27; *see also* Document No. 30). This six month leave was covered by an "agreement between the Commonwealth of Pennsylvania and the Pennsylvania Social Services Union ('PSSU')". *Id.* Although the six month leave guaranteed the Plaintiff a right to return to work as stated in "Article 17, Section 5b" of the Collective Bar-

gaining Agreement, the Plaintiff remained hospitalized during this six month leave period. *Id.* Indeed, the Plaintiff remained hospitalized until November of 2000. *Id.*

While the Plaintiff was hospitalized, supervisors from the CAO would visit the Plaintiff, reassuring the Plaintiff that he had a "place to come back to" when he recovered. (Document Nos. 27 & 30). However, during these early stages of the Plaintiff's recovery, the Plaintiff's occupational therapists did not know what accommodations would be required in order for the Plaintiff to return to work. *Id.* Thus, the Plaintiff did not request any accommodations from his supervisors. *Id.*

Before the Plaintiff's six month leave expired, the Plaintiff's mother requested an additional six month leave of absence for the Plaintiff. (Document Nos. 27 & 30). This second request for leave was "supported by a letter from Dr. Rocco Santarelli, who wrote that [the Plaintiff's] return to work could reasonably be expected with accommodation". *Id.* The letter also indicated that the Plaintiff's return to work would be approximately in one year. *Id.*

In a letter dated September 13, 2000, the CAO granted the Plaintiff's second request for "sick leave without pay without benefits from September 16, 2000" and ending on March 16, 2001. (Document No. 27; *see also* Document No. 30). The letter also stated that the Plaintiff needed to "notify the Personnel Office in writing 14 days prior to the expiration of the leave period of his intention to return to work." *Id.*

The second six month leave was covered by "Article 17, Section 6" of the agreement between the Commonwealth and PSSU which provided that the Plaintiff had a right to return to work only if a budgeted approved-to-fill vacancy existed "prior to the expiration of the [six]-month period." [1] (Document No. 27).

In December of 2000, the Plaintiff attended a Christmas party at the CAO, "during which he verbally expressed his interest" to Anthony Gigliotti to return to work. (Document No. 27; *see also* Document No. 30). However, the Plaintiff did not indicate to Mr. Gigliotti whether he required accommodations to return to work, nor did the Plaintiff indicate the date for his return to work. *Id.* Indeed, at no time "between December 2000 and February 2001" did the Plaintiff inform the CAO of a date that he would return to work. *Id.*

In a letter dated February 27, 2001, Mr. Gigliotti informed the Plaintiff that his second six month leave of absence was to expire on March 16, 2001. (Document Nos. 27 & 30). Furthermore, the letter stated the following:

You have the following options available upon the expiration of your leave.

1. Return to Work—you may return to work on or before March 16, 2001, if medically able to perform the duties of your classification. A medical release will be required.

2. Apply for Disability Retirement— you should contact the Regional Retirement Counseling Office at . . . to see if you qualify. PLEASE NOTE:

---

1. The Plaintiff admits the veracity of this statement; however, the Plaintiff argues that this limiting provision outlined in the union contract, that the budget approved vacancy must exist prior to the expiration of the six month leave, could be waived "in the event such waiver was required as an accommoda-

tion." (Document No. 31). Additionally, the Plaintiff asserts that federal law which proscribes such limitation supersedes the union contract. *Id.* The Court recognizes the Plaintiff's contention and addresses it in the Discussion section, *supra.*

YOU MUST APPLY FOR DISABILITY RETIREMENT PRIOR TO ANY TYPE OF SEPARATION FROM COMMONWEALTH EMPLOYMENT. If disability retirement is approved, medical/hospital coverage will be fully paid.

3. Voluntary Resignation.

As you consider the above options, please keep in mind that failure to return to work following the termination of a leave without pay shall subject you to disciplinary action up to and including termination effective on the first day after the leave without pay ends.

(Document No. 25, Exhibit G–4).

Sometime in March of 2001, the Plaintiff met with Christopher Roken, a representative from the Office of Vocational Rehabilitation ("OVR"), in order to "seek assistance for his return to work and to have [Mr.] Roken coordinate the process." (Document No. 27; *see also* Document No. 30). Thereafter, on March 13, 2001, Mr. Roken met with Mr. Gigliotti to discuss the Plaintiff's return to work. *Id.* During the meeting, Mr. Roken advised Mr. Gigliotti "that the Center for Assistive and Rehabilitative Technology ('CART') may be able to visit the CAO" in order to evaluate and make recommendations for necessary accommodations the Plaintiff will need in order to perform his job. *Id.*

On March 16, 2001, a work-site evaluation meeting was held at the CAO (Document Nos. 27 & 30). The Plaintiff, Mr. Gigliotti, Mr. Roken, union representatives, and representatives from OVR and CART were all present at the meeting. *Id.* The Plaintiff's condition at the time of the meeting was as follows:

[The Plaintiff] utilized a powered tilt-n-space chair for his mobility needs, and continuous oxygen for his respiratory needs ... He received attendant care and was dependent for all of his activities of daily living including feeding, bathing, dressing, and bowel and bladder management ....

(Document No. 27; *see also* Document No. 30).

While at the meeting, the representative from CART offered general recommendations regarding telephone and computer assistive technology that the Plaintiff could use at work. (Document No. 27; *see also* Document No. 30). The CART representative also suggested that "a full evaluation take place at the Center for Assistive and Rehabilitative Technology" in order to assess thoroughly the accommodations necessary for Plaintiff's return to work. *Id.*

On March 16, 2001, the same date as the meeting, there were two vacancy postings at the CAO for two Income Maintenance Caseworker positions. (Document Nos. 27 & 30). According to the Defendant, the "filling of these positions ... was subject to approval of a Complement Authorization Request" ("CAR"). (Document No. 27). CAR approval indicates that the Commonwealth of Pennsylvania has agreed to fund the position with its budget. *Id.* As of March 20, 2001, CAR approval was obtained for these two vacancy positions. *Id;* (*see also* Document No. 30).

The Defendant contends that according to the terms of the Collective Bargaining Agreement, Article 17, Section 6, the Plaintiff was not permitted to return to work on March 16, 2001 because CAR approval for the two vacancy positions was not obtained. (Document No. 27). Thus, at the conclusion of the meeting, the Defendant asserts that the "CART [representative] could not and did not make work[-]site recommendations". *Id.*

Conversely, the Plaintiff contends that pursuant to other provisions in the union contract, the limiting CAR approval provision could be "waived if an accommodation

is required under federal law" (Document No. 30). Furthermore, the CART representative did offer some recommendations during the meeting; however, according to the Plaintiff the CART representative was unable to proceed with additional recommendations because the Defendant stated that the Plaintiff no longer was employed by the Defendant, and the CART representative was "unwilling to conduct a full evaluation under those circumstances". *Id.*

The parties agree that during the meeting on March 16, 2001 the Plaintiff presented to Mr. Gigliotti a note dated March 14, 2001 from Dr. Bruno Romeo. (Document Nos. 29 & 31). The note stated that the Plaintiff was able to return to work part-time on March 16, 2001, and that the Plaintiff could not work any longer than 20 hours per week. *Id.* Upon receipt of the note, Mr. Gigliotti stated that the CAO did not have any part-time work to offer the Plaintiff, thus, the note was unacceptable under the terms of the letter dated February 27, 2001, as it did not release the Plaintiff for full-time employment with the CAO. *Id; see also* Document No. 25, Exhibit G–4. Consequently, on the same day, the Plaintiff contacted Dr. Romeo, and a note from Dr. Romeo was faxed to the CAO "stating the [the Plaintiff] could work 'full-time'." *Id.*

Upon receipt of the second note from Dr. Romeo, the Defendant determined that the second note releasing the Plaintiff for full-time employment was insufficient as it contradicted the earlier note from Dr. Romeo. (Document No. 30). Conversely, the Plaintiff asserts that the second note was sufficient as the first note was presented merely to ensure that the Plaintiff could continue his regime of physical therapy. (Document No. 27). Nevertheless, the Plaintiff was not permitted to return to work for the following two reasons: (1) the Plaintiff failed to provide Defendant with a sufficient medical release; and (2) an approved-to-fill vacancy did not exist on March 16, 2001. (Document Nos. 27 & 30).

In a letter dated April 6, 2001 Mr. Gigliotti sent a follow-up response to the meeting held on March 16, 2001. The letter reads in relevant part:

At the time you were in the office, there was a Vacancy Posting for two [Income Maintenance Caseworker] positions within our office, subject to [Complement Authorization Request] approval, but approval had not yet been received. I informed you that until CAR approval is received, we do not have a vacancy and; therefore, you did not have a position in which to return. On March 20, 2001, we received approval to fill these two IMC positions.

All leave is covered under the Agreement between Commonwealth of Pennsylvania and PSSU. During your first six months sick leave without pay with benefits you were guaranteed a right of return as stated in Article 17, Section 5b. Your second six months sick leave without pay without benefits is covered by Article 17, Section 6, and only gives you a right of return if a budgeted approved-to-fill vacancy exists prior to the expiration of that six-month period. As of the close of business on March 16, 2001, you were no longer an employee of this office.

We are still willing to work with you regarding any employment goals/plans you may have for either this office or another CAO. However, we still require the following documentation which, to date, has not been forthcoming:

1) Complete Medical Certificate clearing you for full-time employment, as well as information attesting to your

ability to perform the Essential Functions of the Job (see attached), with or without accommodations;

2) Final recommendations from CART for work-related accommodations.

When these documents are provided, we will submit for ADA and Labor Relation approval, and at that time, you may then be in a position to seek reinstatement to Income Maintenance Caseworker vacancies in the Clearfield CAO. If you wish to be considered for positions in other CAO's, you could either take the Civil Service test, thus getting on the outside employment list, or you could send reinstatement requests to all the CAO's in which you have an interest in working. Even if we were to re-post one of the positions that were posted at the time of your visit so that you could seek reinstatement, you would still need to provide the aforementioned items.

(Document No. 25, Exhibit 7 attached to O'Dell Deposition).

On April 10, 2001, Mr. Gigliotti attended a monthly meeting of the Clearfield County Board of Assistance, "the entity which had the ultimate authority to reinstate [the Plaintiff]". (Document No. 27; *see also* Document No. 30). During this meeting, Mr. Gigliotti discussed the Plaintiff's circumstances with the Board. *Id.* It was decided by the Board that it would work toward reinstatement of the Plaintiff once the Plaintiff provided the necessary documentation outlined in the April 6, 2001 letter. *Id.* It was also decided that Patri-

cia Lippert, Mr. Gigliotti's administrative assistance, would coordinate the Plaintiff's return to work in May of 2001. *Id.* Additionally, Michele McDevitt, "who served as DPW's Disability Services Coordinator, was working with the CAO and CART to coordinate accommodations." (Document No. 27).

On May 8, 2001, Mr. Gigliotti attended another monthly meeting, where the Board again discussed the Plaintiff's situation. (Document Nos. 27 & 30). The Board observed that the Plaintiff had not yet submitted the required medical release form. *Id.* The Board also noted that neither the OVR or CART had submitted a list of recommendations.[2] *Id.*

On May 24, 2001, Ms. Lippert received a copy of the CART evaluation that was performed on March 16, 2001. (Document Nos. 27 & 30). However, Ms. Lippert and the CAO were not certain as to whether the Plaintiff followed the CART representative's suggestion on March 16, 2001 that "a full evaluation take place at the Center for Assistive and Rehabilitative Technology" in order to assess thoroughly the accommodations necessary for Plaintiff's return to work. *Id.* Thus, Ms. McDevitt "indicated that she would check with Tamra Pelleschi of CART to see if the evaluation had been done." (Document No. 27).

On June 12, 2001, Mr. Gigliotti attended another monthly meeting, wherein the Plaintiff's circumstances were addressed.[3] (Document Nos. 27 & 30). Mr. Gigliotti informed the Board that he received CAR approval to fill the vacancies that were

---

**2.** The Plaintiff contends that he had already submitted two acceptable medical release forms on March 16, 2001. (Document No. 31). Furthermore, the Plaintiff asserts that the OVR and CART could not perform an evaluation of appropriate accommodations because the CAO claimed that the Plaintiff was no longer employed with the CAO. *Id.*

The Court addresses these arguments in the Discussion section, *infra*.

**3.** The record in the case *sub judice* indicates that Mr. Gigliotti continued to advise the Board of the Plaintiff's employment status at the September 18, 2001 and October 9, 2001 meetings. (Document Nos. 27 & 30).

posted on March 15, 2001. *Id.* Thereafter, the Board "agreed that if [the Plaintiff] provides the needed medical documentation verifying that he can perform the essential functions of the job with or without accommodation, it would consider him for future vacancy." (Document No. 27).

On June 13, 2001, the Plaintiff obtained a medical release letter from Dr. Romeo which stated:

> Mr. O'Dell has been a patient of mine since December 6th of the year 2000. As I'm sure you are well aware, he has suffered a spinal cord injury at C5 and C6 and has undergone extensive rehabilitative therapy for his injuries. I last saw Mr. O'Dell in the office on 6/4/01 and he has been doing well. He had no complaints at that visit. His physical exam was essentially unremarkable except for the obvious neurologic deficits.
>
> Despite his neurologic deficits secondary to his accidents on reviewing the essential job function for an income maintenance case worker that was prohibited. At the present time, I see no reason that Mr. O'Dell could perform[4] these functions. Obviously with the limitations of ambulation and standing, but otherwise I do not see any function that would be prohibited for him to complete.
>
> If there are any further questions, please feel free to contact my office.

(Document No. 25, Exhibit G–8 attached to Gigliotti Deposition).

On August 27, 2001, "James Lemmo, a supervisor from the CAO attended a worksite evaluation held at the Hiram G. Andrews Center to observe the evaluation of [the Plaintiff]". (Document No. 27). The next day, on August 28, 2001, Mr. Lemmo met with Sylvia Mallon, a CAO Office Manager, Mr. Gigliotti, and Ms. Lippert to inform them of the results of the Plaintiff's evaluation. *Id; see also* Document No. 30. According to the CART results, Mr. Lemmo indicated that the Plaintiff would require the following accommodations: "a) Wireless keyboard and wireless mouse[;] b) Dictaphone plus clerical support[;] c) On-line forms[;] d) Electronic stapler and hole punch[;] e) Hydraulic split desk[;] f) Personal tape recorder[;] g) Telephone with headset". *Id.*

On September 7, 2001, the Plaintiff was contacted by Ms. Lippert regarding an IMC vacancy that may be available in the next couple of months. (Document Nos. 27 & 30). These vacancies were awaiting CAR approval. *Id.* Ms. Lippert also advised the Plaintiff that he needed to provide the requisite medical release statement before he could return to work. *Id.* With regard to accommodation requirements, Ms. Lippert asked the Plaintiff during their conversation whether the Plaintiff "preferred a voice activated PC or a mini keyboard as an accommodation". (Document No. 27). The Plaintiff responded that CART could determine what accommodation he needed. *Id; see also* Document No. 30. Before the conversation ended, the Plaintiff asked Ms. Lippert if she could provide a letter to CART informing CART that a vacancy would become available in the near future. *Id.* Ms. Lippert agreed to prepare a letter for CART. *Id.*

On September 10, 2001, Ms. Lippert sent a letter to CART informing CART

---

4. The Court observes that there is disagreement between the parties regarding Dr. Romeo's intended communication in this letter. For example, the Plaintiff asserts that there is a typographical error wherein Dr. Romeo meant to include the word "not" between "could" and "perform" of the second paragraph; however, the Defendant argues that the medical verification was insufficient, thus the Defendant could not return the Plaintiff to work based upon the June 13, 2001 letter. (Document Nos. 27 & 30).

that an IMC vacancy may become available in the near future. (Document Nos. 27 & 30). Additionally, Ms. Lippert's letter requested that CART make determinations on the following accommodations: "a. A voice activated PC vs. a wireless keyboard and mouse[;] b. A need for a job coach and/or personal assistant[;] c. Telephone with headset[;] d. Hydraulic split desk[; and] e. Other accommodations as needed". *Id.* The CAO also requested that CART arrange a workday evaluation of the potential IMC vacancy in order to determine the Plaintiff's ability to perform the essential functions of the job. *Id.*

On September 11, 2001, the Plaintiff obtained another letter from Dr. Romeo which read as follows:

> As you know, Mr. O'Dell is a patient of mine since December 6th of the year 2000. He has suffered a spinal cord injury at the C5, C6 level and has undergone extensive rehab therapy for his injuries. The patient has asked me to send you a letter in regards to my opinions on his ability to resume his former position. His last visit in the office was 6/4/01 and at that time was doing well. his (sic) examination was unremarkable except for his obvious neurologic deficits which has him confined to a wheelchair.
>
> Despite his neurologic deficits secondary to his spinal cord lesion, upon reviewing the job description for an income maintenance case worker, I see no reason at this time that he could not preform the functions of a[sic] income maintenance case worker. Obviously, he has the limitations of ambulation and standing, but he is mobile with his wheelchair and has good use of his upper extremities.
>
> If there are any further questions, please feel free to contact my office. (Document No. 25, Exhibit G–7 attached to Gigliotti Deposition). This letter was

"date stamped as received in the CAO on October 25, 2001, and was deemed acceptable by the CAO." (Document No. 27; *see also* Document No. 30).

On October 24, 2001, the Plaintiff submitted a request for reinstatement which was suggested in the letter from Mr. Gigliotti on April 6, 2001. (Document Nos. 27 & 30). Thereafter, Mr. Gigliotti advised the Board that the Plaintiff fulfilled all the requirements necessary in order to reinstate the Plaintiff to work. *Id.* As a result, the Board approved a motion to reinstate the Plaintiff to the position of IMC "with a start date to begin when all accommodations and office renovations are in place." (Document No. 27; *see also* Document No. 30). Additionally, Mr. McDevitt informed the Office of Income Maintenance ("OIM") that it could begin the funding process for the accommodations that the Plaintiff would need. *Id.*

On December 13, 2001 a meeting was held to discuss accommodations for the Plaintiff. (Document Nos. 27 & 30). The Plaintiff, representatives from CART and OVR, and representatives of the CAO were all present. *Id.* The following accommodations were discussed: "a specially designed workstation, compatible telephone and computer equipment/hardware accommodations and clerical support." *Id.* Additionally, the following decisions were reached at the meeting: "1) No job coach was needed; 2) a personal attendant is needed during breaks and lunch; 3) [the Plaintiff] prefers a Logitech infrared keyboard and mouse; 4) a lap tray for the keyboard; 5) an adjustable workstation; 6) headset for his wall-mounted phone; and, 7) some version of on-line forms due to [the Plaintiff's] inability to grip a writing implement." *Id.* The Plaintiff would also be provided a printer/copier at his workstation. *Id.* Furthermore, the Plaintiff would be provided a handicap accessible

restroom. *Id.* The members present at the meeting also determined that once the above-mentioned accommodations were in place, CART would hold "a mockup worksite evaluation for an entire workday at the CAO." (Document No. 27; *see also* Document No. 30).

On March 5, 2002, Ms. McDevitt advised Mr. Gigliotti on how to request the necessary funding for the Plaintiff's accommodations.[5] (Document Nos. 27 & 30). Thereafter, on April 8, 2002, Mr. Gigliotti sent in a request form to DPW's central office requesting approval for the installation of a voice/date cable and phone set with speaker and headset. *Id.*

On May 1, 2002, Mr. Gigliotti prepared a CAR form to fill a vacancy, and the CAR form was approved on May 3, 2002. (Document Nos. 27 & 30).

On May 15, 2002, Mr. Gigliotti and Ms. Lippert discussed with James Weaver, Director of Program Support in Harrisburg, whether voice recognition software would be an appropriate accommodation for the Plaintiff in his worksite environment. (Document Nos. 27 & 30). Mr. Weaver determined that the voice recognition software would be unacceptable in this particular environment as such software should be implemented in a quiet setting. *Id.*

During the next month, other accommodations were made available to the Plaintiff. For example, on June 2, 2002, office software was purchased by the Defendant in an effort to accommodate the Plaintiff. (Document Nos. 27 & 30). Specifically, Paper Port software was purchased to al-low the Defendant's forms to be scanned and then made available to the Plaintiff online.[6] *Id.* Also, on June 6, 2002, Ms. Lippert contacted the Plaintiff to discuss additional accommodations. *Id.* In particular, Ms. Lippert informed the Plaintiff that the following equipment was made available for him: "a) a telephone w/speaker, b) mouse w/ball[,] and, c) bi-level table with motor to adjust heights". *Id.* They also discussed where to order his mouth stick and accessories accommodations and whether the Plaintiff preferred voice-recognition software or a tape recorder. *Id.* During this conversation, the Plaintiff asked when he would be able to return to work, and Ms. Lippert responded that he may be able to return as early as June, but she was uncertain of an exact start date. *Id.* In the meantime, on June 13, 2002 Ms. Lippert ordered a mouth stick, various tips, and adapters as accommodations for the Plaintiff. *Id.*

On June 17, 2002, Ms. Lippert contacted the Plaintiff to ask the Plaintiff if he would travel to Clarion, Pennsylvania in order to attend training. (Document Nos. 27 & 30). The Plaintiff requested that the training provided to him be in-house training, as the cost of travel to Clarion would include a driver and a nurse on a daily basis. *Id.* Consequently, Ms. Lippert was able to change his training location from Clarion, Pennsylvania to Clearfield, Pennsylvania. *Id.* This training was to commence from July 15, 2002 through September 20, 2002. *Id.* During this training, the CAO determined that "various supervisors would

---

**5.** Both parties recognize that since the Clearfield CAO is a state agency, "purchases of various equipment and systems have to be approved at the central office. [Furthermore, t]he Commonwealth has a contract with Telecommunication Systems Management, Inc. to provide cable/phone service, and this is the only vendor that DPW is permitted to use."

(Document No. 27; *see also* Document No. 30).

**6.** The Plaintiff contends that the date of purchase of the Paper Port software is a source of contention as the Defendant was aware that the Plaintiff planned to return to work some fifteen months prior to the purchase. (Document No. 30).

train [the Plaintiff] in their field of expertise. . . ." *Id.*

On July 1, 2002, Mr. Gigliotti sent a letter to the Plaintiff informing him of his reinstatement to the CAO. (Document Nos. 27 & 30). Thereafter, on July 3, 2004, Mr. Roken of OVR advised Mr. Gigliotti and Ms. Lippert that the Plaintiff would require a job coach upon his return to work. *Id.* Consequently, Ms. Lippert handled the paperwork necessary to get approval for a job coach, and she made arrangements for Beth Rogers, a job coach from Goodwill Industries of Northern Pa, to sign the requisite paperwork. *Id.* Mr. McDevitt also assisted with obtaining a job coach for the Plaintiff. *Id.*

On July 15, 2002, all of the accommodations for the Plaintiff were available when the Plaintiff began IMSTP training at the worksite. (Document Nos. 27 & 30). Specifically, the following accommodations were in place: "a) telephone w/speaker, voice and telephone line—completed April 24, 2002; b) mouse with ball—received May, 2002; c) bi-level table with motor to adjust heights—received May 1, 2002; d) mouth stick, tips and adapters—received June 11, 2002." *Id.*

## PROCEDURAL BACKGROUND

Prior to the Plaintiff's return to work on July 15, 2002, the Plaintiff filed the above-captioned civil action against DPW Secretary Feather O. Houston and the DPW, "asserting that the [D]efendants violated Titles I and II of the American with Disabilities Act (hereinafter 'ADA'), 42 U.S.C. §§ 12112 and 12132 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794." (Document No. 26). The Plaintiff filed suit against Defendant Secretary O. Houston in her official capacity only, "seeking injunctive relief in the form of placement in the position of Income Maintenance Caseworker." *Id.* The Plaintiff also seeks compensatory damages from the Defendant DPW under the Rehabilitation Act. *Id.*

On March 31, 2003, a Memorandum Order from the United States District Court for the Western District of Pennsylvania dismissed all of the Plaintiff's claims for injunctive relief, as the Plaintiff had already returned to his position with the DPW. (Document No. 9). Thus, the Plaintiff's only remaining claim is the alleged violation by the Defendant DPW of Section 504 of the Rehabilitative Act for compensatory damages. *Id; see also* Document No. 26.

On March 25, 2004, the Defendant DPW filed a Motion for Summary Judgment with regard to the Plaintiff's remaining claim.

## STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. *Id.* In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reason-

able jury could return a verdict for the nonmoving party. *Id.* at 248–49, 106 S.Ct. 2505. In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over any material fact so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one-sided that the movant must prevail as a matter of law.

To demonstrate entitlement to summary judgment, the moving party is not required to refute the essential elements of the cause of action. The moving party needs only to point out the absence or insufficiency of the evidence offered in support of those essential elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once that burden has been met, the non-moving party must identify affirmative evidence of record that supports each essential element of his cause of action.

A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. *See id.* If the non-moving party does not respond in this manner, the court, when appropriate, shall grant summary judgment. Fed.R.Civ.P. 56(e).

It is on this standard that the Court has reviewed Defendant's motion.

## DISCUSSION

The Plaintiff alleges that the Defendant violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) by preventing the Plaintiff from "performing his job by not participating with good faith in the interactive process of determining the appropriate accommodations." (Document No. 31).

■ Section 504 of the Rehabilitation Act provides, in pertinent part, that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also Speziale v. Bethlehem Area School District*, 266 F.Supp.2d 366, 376 (E.D.Pa. 2003). To establish a prima facie case of discrimination under Section 504, an employee must demonstrate the following: "(1) that she or he has a disability; (2) that she or he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that she or he was nonetheless terminated or otherwise prevented from performing the relevant job duties." *Speziale*, 266 F.Supp.2d at 376; *see also Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 229 (3d Cir.2000); *Shapiro v. Township of Lakewood*, 292 F.3d 356, 360 (3d Cir.2002).

The Court observes that "[i]n 1992 the Rehabilitation Act was amended to incorporate the standards of several sections of the ADA. . . ." *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*, 284 F.3d 442, 455 (3d Cir.2002) (*quoting Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir.1997)). For example, the Rehabilitation Act now provides:

The standards used to determine whether this section has been violated in a complaint alleging employment discrimi-

nation under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 *et seq.*) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

29 U.S.C. § 794(d) (quoted in *Mengine,* 114 F.3d at 420). Consequently, the 1992 amendment to the Rehabilitation Act included the ADA section defining "reasonable accommodation." *Id.*

Under "a regulation issued pursuant to the ADA", *Shapiro,* 292 F.3d at 359, in order to determine a "reasonable accommodation" for a disabled employee, "it may be necessary for the [employer] to initiate an informal, *interactive process* [7] with [the employee] in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3) (quoted in *Shapiro,* 292 F.3d at 359)(emphasis added).

■ The Third Circuit elaborated on the interactive process explaining it as follows:

When the interactive process works well, it furthers the purposes of the Rehabilitation Act and the ADA. The employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company. Thus, the interactive process may often lead to the identification of a suitable position. If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA or Rehabilitation Act violation.

*Mengine,* 114 F.3d at 420 (quoted in *Shapiro,* 292 F.3d at 359).[8] Underlying the interactive process is the duty of the parties "to act in good faith" while searching for appropriate reasonable accommodation. *Mengine,* 114 F.3d at 420.

■ In the case *sub judice,* the parties agree that the Plaintiff is a disabled individual, that the Defendant knew of the disability, and that with accommodation, the Plaintiff could perform the essential functions of his job. However, the positions of the parties diverge in that the Plaintiff asserts that the Defendant has failed to make reasonable accommodations pursuant to the standards and goals of the Rehabilitation Act. More specifically, the Plaintiff alleges that the Defendant did not participate in good faith in the interactive process endorsed by the Third Circuit in *Mengine.* However, the Defendant asserts that the Plaintiff's claim fails as a matter of law since the Defendant has provided the Plaintiff reasonable accommodations which allowed the Plaintiff to return to work.

---

7. The ADA does not specifically refer to the "interactive process"; however, the Third Circuit in *Mengine, supra,* has embraced the concept of the "interactive process" as it applies to the ADA and the Rehabilitation Act.

8. The Court recognizes that the Equal Employment Opportunity Commission (hereinafter "EEOC") also provides:

Once a qualified individual with a disability has requested provision of a reasonable ac-

commodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.

29 C.F.R. pat. § 1630, app. 1630.9 at 359 (quoted in *Conneen v. MBNA America Bank, N.A.,* 334 F.3d 318, 330 (3d Cir.2003)).

In order for Plaintiff to establish that the Defendant did not participate in the interactive process, the Plaintiff must show the following:

1) the employer knew about the employer's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor v. Phoenixville School District,* 184 F.3d 296, 319–320 (3d Cir.1999). In the case *sub judice,* the Plaintiff has asserted that the Defendant failed to make a good faith effort to assist him in seeking accommodations and that he could have reasonably been accommodated but for the Defendant's "obstruction" as evidenced in the alleged violations:

1) [the] Defendant demanded that [the P]laintiff return to work by a certain day, threatened his job if he failed to return, and then refused to let him work when he did return to work on that date[;]

2) [the] Defendant refused to consider part-time work as a reasonable accommodation[;]

3) [the] Defendant refused to accept numerous medical releases[;]

4) [the] Defendant never considered [the Plaintiff] for one of two vacant positions open on March 16, 2001[;]

5) [the] Defendant's policy of requiring that all accommodations be determined and in place before an employee returns to work violated the Rehabilitation Act[; and]

6) the 16 month delay in returning [the Plaintiff] to work was unreasonable[.]

(Document No. 31).

Conversely, the Defendant asserts the following: "[the Defendant] clearly accommodated [the Plaintiff] and returned him to work on July 15, 2002"; "the record clearly demonstrates that the [Defendant] was involved in the interactive process"; "the [Defendant] participated in the interactive process in good faith"; and "much of the [delay in returning the Plaintiff to work] is attributed to [the Plaintiff's] inability to get appropriate medical documentation which stated clearly and unequivocally that he could return to work and perform the functions". (Document No. 26).

The Court observes that unsurprisingly, each side blames the other for the breakdown in the interactive process. Thus, the question becomes which party was responsible for the alleged delay in the interactive process. The Court determines that based upon the facts of record in the case *sub judice* a genuine issue of material fact remains as to whether the Plaintiff's request for a reasonable accommodation was granted with good faith effort on the part of the Defendant, or whether the Defendant obstructed those requested accommodations resulting in a 16–month delay in Plaintiff's return to work. Accordingly, although the Court recognizes that the Plaintiff was ultimately provided reasonable accommodation, the Court shall deny the Defendant's motion for summary judgment as a matter of law where the inferences in favor of the Plaintiff present a genuine issue of material fact regarding good faith effort on the part of the Defendant in returning the Plaintiff to work.

The record of court also reflects the Defendant's position that it entered into the interactive process in good faith while also adhering to its policies regarding filling vacant positions. In particular, the Defendant filled posted vacancies "pending ... CAR approval." (Document No. 25, Attachment No. 6). Once a vacancy was

approved, then the position was filled in accordance with union contract provisions. *Id.* For example, according to the terms of the union contract, "after the expiration of [the Plaintiff's second] six months, he no longer has any right to any position with the State of Pennsylvania whatsoever." *Id.* The Plaintiff argues, however, that a reasonable accommodation would have been to hold one of the vacant positions open for two business days after the Plaintiff's six month leave expired. (Document No. 31).

The Court observes that in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), "the Supreme Court considered the question whether an employer may be required by the ADA's reasonable accommodation requirement to deviate from a disability-neutral rule." *Shapiro*, 292 F.3d at 360. In response, the Supreme Court outlined the following framework as applied to a disability-neutral seniority system rule:

> [A] plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases [and that o]nce the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.[9]

*U.S. Airways, Inc. v. Barnett*, 122 S.Ct. at 1523 (quoted in *Shapiro*, 292 F.3d at 360). Consequently, the Third Circuit has inter-

preted the holding in *Barnett* as a "two-step approach for cases in which a requested accommodation in the form of a job reassignment is claimed to violate a disability-neutral rule of the employer."[10] *Shapiro*, 292 F.3d at 361. Specifically, the Third Circuit has provided the following approach:

> The first step requires an employee to show that the accommodation is a type that is reasonable in the run of cases. The second step varies depending on the outcome of the first step. If the accommodation is shown to be a type of accommodation that is reasonable in the run of cases, the burden shifts to the employer to show that granting the accommodation would impose an undue hardship under the particular circumstances of the case. On the other hand, if the accommodation is *not* shown to be a type of accommodation that is reasonable in the run of cases, the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case.

*Shapiro*, 292 F.3d at 361.

The Court determines that in the case *sub judice*, the showing by the Defendant that hiring an employee for a vacant position unapproved by CAR is a violation of the union contract may be sufficient by itself to establish that the requested accommodation by the Plaintiff is unreasonable. However, the Court also determines that the Plaintiff "remains free to show that special circumstances" exist such that

---

9. The Supreme Court also determined in *Barnett* that "an 'employer's showing of violation of the rules of a seniority system is by itself ordinarily sufficient' to show that the requested accommodation is unreasonable, but that the employee 'remains free to show that special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA does not trump in the run of cases), the requested 'accommodation' is 'reasonable' on the particular facts.' " *Barnett*,

122 S.Ct. at 1525 (quoted in *Shapiro*, 292 F.3d at 361).

10. The Court notes that although the Plaintiff did not specifically request a job reassignment in the case *sub judice*, it is clear from the record of court that the Plaintiff requested a return to work for any vacant position in which he could reasonably be accommodated.

the Plaintiff's request to hold one of the vacant positions available on March 16, 2001 would have been reasonable on the particular facts. Accordingly, the Court denies the Defendant's motion for summary judgment as a matter of law where a genuine issue of material fact exists regarding the Plaintiff's requested accommodation and the reasonableness of deviating from the disability-neutral rule established in the union contract.

An appropriate order follows.

## ORDER

**AND NOW**, this 28th day of September, 2004, after careful consideration, and for the reasons set forth in the accompanying Opinion, **IT IS HEREBY ORDERED** that the Motion for Summary Judgment is denied.